1   Laurence M. Rosen (SBN 219683)
2   **THE ROSEN LAW FIRM, P.A.**
    355 South Grand Avenue, Suite 2450
3   Los Angeles, CA 90071
    Telephone: (213) 785-2610
4   Facsimile: (213) 226-4684
    Email: lrosen@rosenlegal.com
5
    *Counsel for Plaintiff*
6

7

8                   **IN THE UNITED STATES DISTRICT COURT**
9                   **NORTHERN DISTRICT OF CALIFORNIA**

10  JOSEPH ROBINSON, derivatively on behalf of
    CHEGG, INC.,
11
                                                        Case No.:
12          Plaintiff,

13          v.

14  DANIEL L. ROSENSWEIG, ANDREW. J.          DEMAND FOR JURY TRIAL
    BROWN, NATHAN SCHULTZ, JOHN P.
15  FILLMORE, ROBIN TOMASELLO,
    RICHARD SARNOFF, SARAH BOND,
16  RENEE BUDIG, PAUL LeBLANC, MARNE
    LEVINE, TED SCHLEIN, MELANIE
17  WHELAN, and JOHN YORK,

18          Defendants,

19          and

20  CHEGG, INC.,

21          Nominal Defendant.

22

23          <u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

24

25

26

27

28

**INTRODUCTION**

Plaintiff Joseph Robinson ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Chegg, Inc. ("Chegg" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Daniel L. Rosensweig ("Rosensweig"), Andrew. J. Brown ("Brown"), Nathan Schultz ("Schultz"), John P. Fillmore ("Fillmore"), Robin Tomasello ("Tomasello"), Richard Sarnoff ("Sarnoff"), Sarah Bond ("Bond"), Renee Budig ("Budig"), Paul LeBlanc ("LeBlanc"), Marne Levine ("Levine"), Ted Schlein ("Schlein"), Melanie Whelan ("Whelan"), and John York ("York") (collectively, the "Individual Defendants," and together with Chegg, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Chegg; against Defendants Rosensweig, Sarnoff, Bond, Budig, LeBlanc, Levine, Schlein, Whelan, and York for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); and against Defendants Rosensweig, Brown, Schultz, Fillmore, Tomasello, and Sarnoff for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Chegg, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This shareholder derivative action seeks to remedy wrongdoing committed by Chegg's current and former directors and officers from May 5, 2020 through November 1, 2021 (the "Relevant Period").

2.      Chegg is a California-based provider of online education tools and services. Its products and services include digital learning tools, including tutoring, as well as physical educational resources such as textbook rentals. The Company collects subscription fees for its products and services.

3.     Chegg experienced a surge in subscribers and revenue in 2020 due to the onset of the coronavirus pandemic and the shift by a wide range of educational institutions to online learning.

4.     The Company's online platform was designed, among other purposes, to enable students to cheat on assignments and exams. The rapid shift to online learning caused assignments and exams previously administered in person to be administered online, creating new opportunities for students to use the Company's platform to cheat. Prior to and during the Relevant Period, the Individual Defendants caused Chegg to monetize its platform's capacity to enable cheating in academic settings, including by providing users of the platform certain answer sets to copyrighted questions produced by textbook manufacturers, such as Pearson Education, Inc. ("Pearson"), without permission (the "Copyright Infringement Misconduct") (collectively, the "Cheating Misconduct").

5.     While the Company experienced growth, it did not acknowledge that increases in subscribers and revenue resulted from the Cheating Misconduct and the temporary spike in online learning caused by the pandemic. Additionally, the Company failed to acknowledge that it would experience foreseeable declines in subscribers and revenue once students returned to classrooms in person and the opportunities to use the Company's services to cheat diminished.

6.     Instead of acknowledging the foregoing, throughout the Relevant Period, the Individual Defendants made and/or caused Chegg to make materially false and misleading statements and omissions of material fact that attributed the Company's recent growth to other, more optimistic considerations such as the Company's "strong brand and momentum" and its "unique position to impact the future of the higher education ecosystem." The Individual Defendants caused the Company to maintain as though these optimistic factors, rather than the Company's facilitation of cheating and growth during the pandemic, would cause the Company "to continue to grow and take advantage of the ever-expanding opportunities in the learner economy."

7.     The truth began to emerge in December 2020, when news organizations reported the discovery by officials at Texas A&M University ("Texas A&M") that students were using Chegg to cheat on exams administered remotely. The cheating included copying and pasting answers made available to Chegg users from an online repository. The officials discovered that, using the Company's

services, some students were able to complete exams so quickly that they could not possibly have been reading the questions.

8.     On September 13, 2021, the truth continued to emerge, when Pearson filed a lawsuit against Chegg in the United States District Court for the District of New Jersey (the "Pearson Lawsuit"), revealing that Chegg engaged in the Copyright Infringement Misconduct by making available to its users certain answer sets to Pearson's copyrighted questions.

9.     The truth emerged in full on November 1, 2021 after markets closed. Chegg issued a press release and filed its Form 10-Q with the SEC revealing the Company's financial results for the fiscal quarter ended September 30, 2021, which period included the start of the first academic semester since the onset of the pandemic where online learning was significantly cut back. The Company revealed, *inter alia*, that: (1) it had a lower number of subscribers than expected; (2) key revenue metrics had contracted or seen decelerated growth; and (3) the Company would not be issuing guidance for the 2022 fiscal year. In addition, Defendant Rosensweig revealed that the dramatic deceleration in Chegg's growth was known internally as early as September 2021.

10.     On this news, the price per share of the Company's common stock fell from its closing price of $62.76 per share on November 1, 2021 to close at $32.12 per share on November 2, 2021, a decline of nearly 50%.

11.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by making and/or causing Chegg to make materially false and misleading statements about the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused Chegg to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was engaged in the Cheating Misconduct and the Copyright Infringement Misconduct; (2) the Company's increase in subscribers and revenue was attributable to its facilitation of cheating in an environment of heightened remote learning, rather than to the factors the Company described; (3) as a result of the foregoing, the Company's surge in subscriptions and revenue would subside once in-person learning returned; (4) as a result of the foregoing, Chegg exaggerated its growth potential throughout the Relevant Period; and (5) the Company failed to maintain internal controls. As a result of the foregoing,

Chegg's public statements were materially false and misleading at all relevant times.

12.     The Individual Defendants also breached their fiduciary duties to the Company by failing to correct and/or causing Chegg to fail to correct these false and misleading statements and omissions of material fact.

13.     The Individual Defendants also breached their fiduciary duties by causing or permitting the Company to engage in the Cheating Misconduct and the Copyright Infringement Misconduct.

14.     Also in breach of their fiduciary duties, the Individual Defendants caused Chegg to fail to maintain adequate internal controls.

15.     During the Relevant Period, the Individual Defendants further breached their fiduciary duties by causing Chegg to undertake a secondary public offering of its common stock in February 2021, a time at which the Company's securities were trading at artificially inflated prices due to the false and misleading statements described herein. The Company and Defendant Rosensweig sold shares for collective proceeds of more than $1 billion, subjecting the Company to liability for Exchange Act violations and enriching Defendant Rosensweig by an amount of approximately $29.9 million.

16.     Furthermore, six of the Individual Defendants breached their fiduciary duties by engaging in insider sales of Chegg's common stock at artificially inflated prices, reaping proceeds of more than $91.8 million.

17.     The Individual Defendants' misconduct has subjected the Company, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), its President of Learning Services, its President of Chegg Skills, its former Principal Accounting Officer, and its Co-Chairperson to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action").[1] The Individual Defendants' misconduct has further subjected Chegg to the Pearson Lawsuit, the need to remedy the Cheating Misconduct and the Copyright Infringement Misconduct, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, losses from the waste of

---

[1] Defendant Sarnoff is named only in the "Parties" section, and not the caption, of the Securities Class Action complaint.

corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein. As a result of the foregoing, the Company will have to expend many millions of dollars.

18.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

19.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Co-Chairpersons Rosensweig's and Sarnoff's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of Chegg with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

21.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Chegg has its principal executive offices in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## **PARTIES**

24.     Plaintiff is a current shareholder of Chegg common stock and has continuously held Chegg common stock at all relevant times.

25.     Chegg is incorporated in Delaware and maintains its principal executive offices at 3990 Freedom Circle, Santa Clara, CA 95054. Chegg's trade on the New York Stock Exchange ("NYSE") under the ticker symbol "CHGG."

26.     Defendant Rosensweig has served as Chegg's CEO and President since February 2010, and as Co-Chairperson since July 2018. For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Rosensweig received $10,381,080 in total compensation from the Company, including $1,000,000 in salary, $9,374,954 in stock awards, and $6,126 in all other compensation. During the period when Chegg materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Rosensweig sold Chegg stock at artificially inflated prices as follows:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| 5/14/2020 | 28,000 | $63.81 | $1,786,680 |
| 6/29/2020 | 28,000 | $64.84 | $1,815,520 |
| 7/7/2020 | 28,000 | $70.83 | $1,983,240 |
| 8/5/2020 | 28,000 | $84.61 | $2,369,080 |
| 9/22/2020 | 28,000 | $66.26 | $1,855,280 |
| 10/12/2020 | 28,000 | $82.24 | $2,302,720 |
| 11/19/2020 | 28,000 | $70.64 | $1,977,920 |
| 12/11/2020 | 28,000 | $81.33 | $2,277,240 |
| 1/7/2021 | 28,000 | $91.12 | $2,551,276 |
| 2/22/2021 | 300,000 | $99.55 | $29,865,600 |

Thus, in total, before the fraud was exposed, he sold 552,000 shares of Company common stock at artificially inflated prices on inside information for proceeds of approximately $48.8 million. His insider sales demonstrate his motive in facilitating and participating in the scheme.

27.     Defendant Brown has served as the Company's CFO since October 2011. For the 2020 Fiscal Year, Defendant Brown received $5,033,556 in total compensation from the Company. This included $652,083 in salary, $4,374,973 in stock awards, and $6,500 in all other compensation.

28.     Defendant Schultz has served as Chegg's President of Learning Services since December 2018. Defendant Schultz served as the Company's Chief Learning Officer from June 2014 to December 2018, Chief Content Officer from May 2012 to June 2014, Vice President of Content Management from 2010 to May 2012, and as Director of Textbook Strategy from 2008 to 2010. For the 2020 Fiscal Year, Defendant Schultz received $5,031,931 in total compensation from the Company. This included $652,083 in salary, $4,374,973 in stock awards, and $4,875 in all other compensation. During the period when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Schultz sold Chegg stock at artificially inflated prices as follows:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| 5/5/2020 | 47,376 | $60.00 | $2,842,560 |
| 6/22/2020 | 35,083 | $70.19 | $2,462,475 |
| 7/31/2020 | 82,459 | $80.34 | $6,624,756 |
| 12/21/2020 | 82,458 | $90.20 | $7,437,711 |
| 4/23/2021 | 30,000 | $92.86 | $2,785,800 |
| 4/26/2021 | 30,000 | $95.26 | $2,857,800 |

Thus, in total, before the fraud was exposed, he sold 307,376 shares of Company common stock at artificially inflated prices on inside information for proceeds of approximately $25.0 million. His insider sales demonstrate his motive in facilitating and participating in the scheme.

29.     Defendant Fillmore has served as the President of Chegg Skills since September 2020. Previously, he served as Chegg's Chief Business Officer from December 2018 to September 2020, its Chief of Business Operations from October 2015 to December 2018, and as Chegg's Business Leader for Required Materials from June 2013 to October 2015. During the period when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Fillmore sold Chegg stock at artificially inflated prices as follows:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| 5/18/2020 | 49,442 | $64.85 | $3,206,313 |
| 6/3/2020 | 1,321 | $62.30 | $82,298 |
| 9/2/2020 | 1,321 | $77.73 | $102,681 |
| 12/3/2020 | 1,321 | $75.55 | $99,801 |
| 3/3/2021 | 51,505 | $92.25 | $4,751,336 |
| 4/13/2021 | 19,714 | $90.34 | $1,780,962 |

Thus, in total, before the fraud was exposed, he sold 124,624 shares of Company common stock at artificially inflated prices on inside information for proceeds of approximately $10.0 million. His insider sales demonstrate his motive in facilitating and participating in the scheme. For the 2020 Fiscal Year, Defendant Fillmore received $3,556,915 in total compensation from the Company. This included $552,083 in salary, $2,999,957 in stock awards, and $4,875 in all other compensation.

30.     Defendant Tomasello served as Chegg's Vice President, Corporate Controller, Assistant Treasurer, and Principal Accounting Officer from January 2012 until November 15, 2021, when she resigned. During the period when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Tomasello sold Chegg stock at artificially inflated prices as follows:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| November 20, 2020 | 32,016 | $71.45 | $2,287,543 |

Her insider sale demonstrates her motive in facilitating and participating in the scheme.

31.     Defendant Sarnoff has served as Co-Chairperson of the Board since July 2018, and as a member of the Board since August 2012. He is currently a member of the Audit Committee. For the 2020 Fiscal Year, Defendant Sarnoff received $399,919 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $349,919 in restricted stock unit ("RSU") awards. During the period when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Sarnoff made the following sale of company stock at artificially inflated prices:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| May 13, 2020 | 66,666 | $65.09 | $4,339,289 |

His insider sale demonstrates his motive in facilitating and participating in the scheme.

32.     Defendant Bond has served as a member of the Board since December 2020, and she is currently a member of the Compensation Committee. For the 2020 Fiscal Year, Defendant Bond received $203,942 in total compensation from the Company. This included $3,984 in fees earned or paid in cash and $199,958 in RSU awards.

33.     Defendant Budig has served as a member of the Board since November 2015, and she is the Chair of the Audit Committee. For the 2020 Fiscal Year, Defendant Budig received $259,980 in total compensation from the Company. This included $60,000 in fees earned or paid in cash and $199,980 in RSU awards.

34.     Defendant LeBlanc has served as a member of the Board since July 2019, and he currently serves as a member of the Governance and Sustainability Committee. For the 2020 Fiscal Year, Defendant LeBlanc received $249,980 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $199,980 in RSU awards.

35.     Defendant Levine has served as a member of the Board since May 2013. She is also the Chair of the Governance and Sustainability Committee and a member of the Compensation Committee. For the 2020 Fiscal Year, Defendant Levine received $269,980 in total compensation from the Company. This included $70,000 in fees earned or paid in cash and $199,980 in RSU awards.

36.     Defendant Schlein has served as a member of the Board since December 2008. He also serves as a member of both the Governance and Sustainability Committee and the Audit Committee. For the 2020 Fiscal Year, Defendant Schlein received $259,980 in total compensation from the Company. This included $60,000 in fees earned or paid in cash and $199,980 in RSU awards.

37.     Defendant Whelan has served as a member of the Board since June 2019. She is also a member of the Compensation Committee. For the 2020 Fiscal Year, Defendant Whelan received $249,980 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $199,980 in RSU awards.

38.     Defendant York has served as a member of the Board since June 2013. He is also Chair of the Compensation Committee and a member of the Governance and Sustainability Committee. for the 2020 Fiscal Year, Defendant York received $269,980 in total compensation from the Company. This included $70,000 in fees earned or paid in cash and $199,980 in RSU awards. During the period when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant York sold Chegg stock at artificially inflated prices as follows:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| July 1, 2020 | 10,000 | $68.04 | $680,400 |
| October 1, 2020 | 10,000 | $73.38 | $733,800 |

Thus, in total, before the fraud was exposed, he sold 20,000 shares of Company common stock at artificially inflated prices on inside information for proceeds of approximately $1.4 million. His insider sales demonstrate his motive in facilitating and participating in the scheme.

## SUBSTANTIVE ALLEGATIONS

### Background

39.     Chegg is a California-based company that offers an online learning platform aimed at high school and college students. The Company's platform provides students with digital tools and other materials to assist them with their schoolwork.

40.     The Company's subscription offerings assist students with a variety of different academic areas, as evidenced by products such as "Chegg Services," including "Chegg Study," "Chegg Math Solver," and "Chegg Writing."

41.     Eighty-one percent of Chegg's revenue for the 2020 Fiscal Year came from Chegg Services business segment, with 19% coming from Chegg's textbook-rental business segment called Required Materials.

42.     The Company's online learning tools have been criticized as going beyond helping students and enabling cheating, a criticism particularly leveled at the online tutoring feature that enables students to ask experts for the answers to their homework questions. In one notable example, Citron Research wrote a short report about Chegg in 2019 describing the Company in the title of the report as "The Poster Child for Institutionalized Cheating."

43.     Chegg experienced a surge in its business upon the onset of the coronavirus pandemic and the associated transition to online learning. In the Company's annual report for the 2020 Fiscal Year filed with the SEC on February 22, 2021, Chegg disclosed that revenue in the Chegg Services segment grew 57% year-over-year in the 2020 Fiscal Year, compared with 31% the prior year. Likewise, in the Required Materials segment, revenue grew 56% year-over-year in 2020, compared to 17% the prior year. The Company also saw significant growth in the number of its subscribers. Specifically, the

Company had 6.6 million subscribers as of the end of 2020, a sharp uptick when compared to 3.9 million subscribers at the end of 2019 and 3.1 million subscribers at the end of 2018.

44.     This profitable surge was driven by the widespread increase in remote learning, which brought new cheating opportunities to students. Instead of disclosing this unfortunate truth, the Individual Defendants made and caused Chegg to make false and misleading statements attributing Chegg's recent successes to other, less distasteful factors.

**The Cheating Misconduct**

45.     The Company's surge in subscribers and revenue was attributable to the Company's facilitation of cheating by students in the era after the onset of the coronavirus pandemic.

46.     The use of the Company's platform for cheating became clear when multiple news outlets[2] reported in December 2020 that Texas A&M officials had discovered that students were using Chegg to cheat on remote examinations, a form of examination made commonplace by the coronavirus pandemic. Some students had copied and pasted answers into online exams and other assignments from a repository Chegg made available to its users. In other cases, students not operating under time constraints were able to post questions to Chegg's website and have Chegg tutors answer, and then pass the tutor's answer off as their own.

47.     According to reporting by these news outlets, in early December 2021, Texas A&M officials emailed hundreds of students regarding the discovery of cheating "on a very large scale." Texas A&M tracking software had detected that some students, using Chegg, were completing exams so quickly that it was not possible for them to have been reading the questions. The *Texas Tribune* quoted the director of the Texas A&M Aggie Honor System Office as stating that there were "hundreds of

---

[2] *E.g.*, Anna Gallegos, IHEART (Dec. 17, 2020), *Hundreds of Texas A&M Students Accused of Using Chegg to Cheat*, https://www.iheart.com/content/2020-12-17-hundreds-of-texas-am-students-accused-of-using-chegg-to-cheat/ (last visited Mar. 30, 2022); ShaCamree Gowdy, CHRON (Dec. 16, 2020), *Hundreds of Students Used Chegg to Cheat During Online Exam, Texas A&M Alleges*, https://www.chron.com/news/houston-texas/education/article/Chegg-Texas-A-M-students-cheating-virtual-classes-15808790.php (last visited Mar. 30, 2022); Kate McGee, TEXAS TRIBUNE (Dec. 16, 2020), *Texas A&M Investigating "Large Scale" Cheating Case as Universities See More Academic Misconduct in Era of Online Classes*, https://www.texastribune.org/2020/12/16/texas-am-chegg-cheating/ (last visited Mar. 30, 2022).

examples" of students answering a question faster than it would take to read the question.[3] The same *Texas Tribune* article noted that students at Boston University and Georgia Tech University had also been caught or investigated for using Chegg.

48.     The Individual Defendants knew or should have known that the surge in the Company's subscribers and revenue—which coincided with the onset of the coronavirus pandemic and a significant transition to remote learning—was attributable to the Cheating Misconduct. Yet, the Company did not reveal the extent to which its financial success depended on the Cheating Misconduct, and it further failed to reveal the likely materially adverse impacts on the Company's finances that would arise once remote learning and associated cheating opportunities ceased.

**The Copyright Infringement Misconduct**

49.     The Cheating Misconduct was made even worse due to Chegg's engagement in copyright infringement as part of the facilitation of students' cheating.

50.     As revealed on September 13, 2021, when Pearson initiated the Pearson Lawsuit, captioned *Pearson Education, Inc. v. Chegg, Inc.*, Case No. 2:21-cv-16866-SDW-ESK (D.N.J.), Chegg engaged in the Copyright Infringement Misconduct by making answer sets to Pearson's copyrighted questions available to Chegg subscribers. Attached to the complaint in the Pearson Lawsuit as an exhibit was a list (Pearson Lawsuit, Document 1 & 1-1) of 150 of Pearson's textbooks for which Chegg was providing answers to hundreds of thousands of questions, thereby engaging in copyright infringement. The complaint in the Pearson Lawsuit further noted that Chegg offered answers for questions from approximately 9,000 textbooks, meaning that Chegg's potential liability for copyright infringement across the full range of titles on Chegg's platform was significantly higher than it was with respect to just the 150 Pearson textbooks at issue in the Pearson Lawsuit.

51.     Accordingly, not only was the Cheating Misconduct the source of Chegg's ostensibly positive financial results and outlook following the onset of the coronavirus pandemic; in addition, the Cheating Misconduct was in part based on Chegg's engagement in the Copyright Infringement Misconduct by providing answers to copyrighted questions. Thus, the Individual Defendants damaged

---

[3] https://www.texastribune.org/2020/12/16/texas-am-chegg-cheating/ (last visited Mar. 30, 2022).

Chegg and exposed it to liability by causing and/or permitting the Copyright Infringement Misconduct and the Cheating Misconduct.

**False and Misleading Statements**

52.     On May 4, 2020, Chegg issued a press release announcing its financial results for the quarter ended March 31, 2020, which was the first quarter in which Covid-19 was present in the United States. The press release was also attached to a Form 8-K filed by the Company with the SEC the same day. The press release contained prepared remarks from Defendant Rosensweig, in which he stated as follows, in relevant part:

> Our belief is that, in every industry, a crisis often accelerates the inevitable and that is what we are seeing happening now in higher education. The reality is students were already learning online, were under supported by their schools who had diminishing budgets, so that the need for virtual learning support was already expanding. ***But, almost overnight, when schools around the world had to move 100% online, that trend accelerated and has revealed the true potential and the value of what Chegg has to offer. The numbers say it best, and what they reflect is that students have an even greater need for high-quality, low-cost, personalized, and adaptive online education to help them learn and master their curriculum.*** As we think about the lasting impact on the future of higher education globally, we see these trends continuing.

(Emphasis added.)

53.     On August 3, 2020, Chegg issued a press release announcing its financial results for the quarter ended June 30, 2020. The press release was also attached to a Form 8-K filed by the Company with the SEC the same day. The press release contained the following prepared remarks from Defendant Rosensweig, in which he stated as follows, in relevant part:

> ***While student's lives were disrupted, the one constant was that Chegg was there to provide high-quality, expert, on-demand support from any device, in any location, which resulted in accelerated growth across our services.*** Students turned to Chegg in record numbers and we experienced unprecedented engagement, with subscriber growth of 67% year-over-year, including our new Mathway subscribers, reaching a record 3.7 million students. This yielded net revenue growth of 63%, year-over-year, in Q2 alone. To put that in perspective, we had more subscribers in Q2 of this year than we had in all of 2018.

> As schools and millions of students wrestle with how best to handle a return to campus, we know that some are supporting a full in-person return, while others are offering a fully online experience, and still others are planning a hybrid version of online and offline. ***Regardless of which experience a student has, Chegg will be there to support students this fall and beyond. In fact, students are increasingly turning to Chegg for support to***

*navigate these uncertain times and we expect this trend to continue post the pandemic*, regardless of where or how someone learns, Chegg will be there for them. From day one, Chegg was built on the inevitability that people would need to learn more often, increasingly online, and need greater support. Long before the global pandemic, we believed the digital transition was coming and education would have to fundamentally change.

(Emphasis added.)

54.     On October 26, 2020, Chegg issued a press release announcing its financial results for the quarter ended September 30, 2020. The press release was also attached to a Form 8-K filed with the SEC the same day. The press release contained the following prepared remarks from Defendant Rosensweig, in which he stated as follows:

It has become apparent to us, that this terrible pandemic has only further highlighted the need for higher education to transition to a model that is more on-demand, student-centric, affordable, and does a much better job of leveraging technology to the advantage of the learner. As evident in our Q3 results, students more than ever before are relying on Chegg as they navigate their semesters, whether they are back on campus or not. And while our business continues to have an extraordinary year, more importantly, we are helping millions of students get through these uncertain times. In Q3, we saw subscriber growth of 69% year-over-year, reaching 3.7 million students in the quarter. This yielded total net revenue growth of 64%, year-over-year. *The inevitable trend towards online learning, the clear need for high-quality online support, and the momentum we are experiencing globally, gives us the confidence to raise our guidance again for 2020 and provide our initial outlook for 2021.* Andy will walk you through all of these numbers shortly, but I would like to take a moment to share with you why we believe our results will continue to perform at such a high level.

*Millions of students around the world are now asking for a better return for their education and demanding a shift to the model we always knew it would become: increasingly online, on-demand, adaptive, affordable, personalized, and tailored to the modern learner.* Chegg has been focused on these things for years so, we believe we are in the best position to not only expand academic support to students but also expand support to learners throughout their professional journey. We have tailored our efforts to reach students on different paths, including more at online schools and community colleges, and we are also seeing increasing demand for online learning support from students around the world.

Even before the global pandemic, there was a real question around the ROI of a college education and students are demanding the ability to learn faster, have their education directly connect to their career path, and accelerate their path from learning to earning. We know that the modern student also looks very different than they once did. They are older, many have families, they are juggling work and school at the same time, so it comes as no surprise that they need more flexibility when it comes to their learning. More than ever before, like everything else in their lives - entertainment, dining, banking - they

expect education to come to them, at the time that is most convenient for them, in the format that they want, at a price they can afford, and that provides a real ROI. Chegg's online learning support platform is designed to serve the students in just this way.

*          *          *

What this means for Chegg is there's an overwhelming need for the services we provide, and we see that in the increased demand and engagement across all our platforms, all over the world. ***And, as students rely on Chegg for more academic support, we continue to expand what we offer, more recently with the acquisition of Mathway. These expanded offerings will also increase the value proposition for Chegg Study Pack, which is why we are seeing higher than expected take rates for that offering, including internationally.***

*          *          *

The other inevitable trend that we have identified is that students everywhere are seeking alternative, less expensive, pathways to pursue their careers. That is why we invested in Thinkful and in skills-based learning. We think our strategy of increasing the curriculum to match to the most in-demand jobs, lowering our prices, offering Income Sharing Agreements, and building in live chat support is a better model than anyone else has to offer.

And while we continue to navigate this complicated time in our history, while so many things have changed, some things remain the same. There will always be a need for students to learn new skills in order to improve their opportunities. There will always be institutional pathways, but they will now be both offline and online. There has always been a need to connect academic to professional pathways and we believe this moment in time will create a major acceleration of that trend. That is why we built Chegg, from day one, to be an advocate for this transition in higher education and why we continue to invest in supporting anyone on their learning journey. This is why we are reinventing the model of learning to earning, with lower priced, higher quality, human support, at scale - all exclusively online.

(Emphasis added.)

## **The Truth Begins Emerging While False and Misleading Statements Continue**

55.     The truth began to emerge in December 2020 when news outlets reported that Texas A&M officials had discovered widespread cheating by students who were using Chegg. However, despite a portion of the Cheating Misconduct being revealed at that time, the full truth remained undisclosed, including the Copyright Infringement Misconduct and the degree to which Chegg's revenue spike was a product of misconduct.

56.     On February 8, 2021, Chegg issued a press release announcing its financial results for the quarter and full year ended December 31, 2020. The press release was also attached to a Form 8-K filed with the SEC the same day. The press release contained the following statement from Defendant Rosensweig, which provided in relevant part as follows:

> We are incredibly grateful that, even in the midst of the many challenges of the past year, we outperformed all expectations and were able to continue to support students, in record numbers, around the world[.] . . . ***The transition to online and hybrid learning is inevitable and, with the accelerated trends that we are seeing, we have the confidence to raise our guidance for 2021.***

(Emphasis added.)

57.     On April 16, 2021, the Company filed its proxy statement on Schedule 14A with the SEC (the "2021 Proxy Statement"). The 2021 Proxy Statement was solicited by Defendants Rosensweig, Sarnoff, Bond, Budig, LeBlanc, Levine, Schlein, Whelan and York pursuant to Section 14(a) of the Exchange Act, and contained material misstatements and omissions.

58.     The 2021 Proxy Statement called for Chegg shareholders to vote to, *inter alia*: (1) elect Defendants LeBlanc, Levine, and Sarnoff as Company directors; (2) approve on a non-binding basis the compensation of the Company's named executive officers, including Defendants Rosensweig, Brown, Schultz, and Fillmore; and (3) ratify the appointment of Deloitte & Touche LLP as Chegg's independent registered public accounting firm for the fiscal year ending December 31, 2021.

59.     The 2021 Proxy Statement stated the following regarding the executive officers' performance-based compensation:

> We grant PSUs [performance-based restricted stock units] because they are linked to stockholder value creation, like RSUs [meaning time-based restricted stock units in this context], but are also leveraged to our financial performance and allow us to set appropriate annual goals that we believe are critical to drive long-term success. On March 1, 2020, the Compensation Committee granted PSU awards to our NEOs subject to the achievement of certain financial performance goals and conditioned on the executive officer's service up to and through the applicable multi-year, time-based vesting dates.
>
> ***These PSUs will be earned and eligible to vest contingent on the achievement of two equally weighted performance metrics: (1) fiscal year 2020 Chegg Services Revenue and (2) fiscal year 2020 adjusted EBITDA (both as defined below). These two metrics were selected because the Compensation Committee believes that Chegg Services Revenue growth and adjusted EBITDA, a non-GAAP measure of profitability, are the most important drivers of stockholder value for Chegg in 2020 as they are primary***

*components of our overall revenue growth and profitability. The selection of these two measures as PSU metrics ensures our executive officers are incentivized in accordance with the long-term interests of our stockholders.* The performance metrics and their timing are synchronized with the board-approved corporate strategic plan and associated metrics and targets.

We currently use a one-year performance period (with a multi-year time-based vesting schedule) to allow us the flexibility to set appropriate annual goals to drive stockholder value given our high growth expectations and the rapidly changing nature of the industry in which we operate. Because of the potential risks to performance and motivation that are associated with improperly setting goals in a high-growth environment, the Compensation Committee has not adopted multi-year performance goals at this time but will continually monitor this topic.

(Emphasis added.)

60. Regarding Chegg's Code of Business Conduct and Ethics (the "Code of Conduct"), the 2021 Proxy Statement stated:

We have adopted a Code of Business Conduct and Ethics that applies to all of our directors, officers and employees. . . . To satisfy the disclosure requirement under Item 5.05 of Form 8-K, any amendments or waivers of our Code of Business Conduct and Ethics pertaining to a member of our Board of Directors or one of our executive officers will be disclosed on our website[.]

The 2021 Proxy Statement also stated that: "Our employees are required to comply with our Code of Business Conduct and Ethics[.]"

61. With respect to the Board's role in risk oversight the 2021 Proxy Statement stated as follows:

Our Board of Directors, as a whole, has responsibility for risk oversight, although the committees of our Board of Directors oversee and review risk areas which are particularly relevant to them. The risk oversight responsibility of our Board of Directors and its committees is supported by our management reporting processes, which are designed to provide visibility to the Board of Directors and to our personnel that are responsible for risk assessment and information management about the identification, assessment and management of critical risks and management's risk mitigation strategies. These areas of focus include, but are not limited to, competitive, economic, operational, financial (accounting, credit, liquidity and tax), legal, regulatory, compliance and reputational risks.

Each committee of the Board of Directors meets in executive session with key management personnel and representatives of outside advisers to oversee risks associated with their respective principal areas of focus. The Audit Committee reviews our major financial risk exposures and the steps management has taken to monitor and control such exposures, including our risk assessment and risk management policies and guidelines. The Governance and Sustainability Committee reviews our major legal compliance risk

exposures and monitors the steps management has taken to mitigate these exposures, including our legal risk assessment and legal risk management policies and guidelines. The Compensation Committee reviews our major compensation-related risk exposures, including consideration of whether compensation rewards and incentives encourage undue or inappropriate risk taking by our personnel, and the steps management has taken to monitor or mitigate such exposures.

62.     Defendants Rosensweig, Sarnoff, Bond, Budig, LeBlanc, Levine, Schlein, Whelan and York caused the 2021 Proxy Statement to be materially false and misleading with regard to the statements contained in ¶¶ 59–61. Specifically, Defendants Rosensweig, Sarnoff, Bond, Budig, LeBlanc, Levine, Schlein, Whelan, and York failed to disclose that: (1) though Chegg asserted that it used certain metrics in awarding performance-based compensation to "ensure[] our executive officers are incentivized in accordance with the long-term interests of our stockholders," the metrics actually rewarded Chegg's executive officers for a short-term increase in revenue caused by a combination of the coronavirus pandemic and the Cheating Misconduct, which metrics would materially decline once widespread remote learning ended; (2) though Chegg claimed its directors and officers adhered to the Code of Conduct and that it would disclose any waivers thereof, the Individual Defendants violated the Code of Conduct either without waivers or without such waivers being disclosed; and (3) the Board and the Board's committees were not properly exercising their risk oversight functions, including the review of the described risk exposures, as evidenced by wrongdoing described herein, which involved certain directors.

63.     Furthermore, the 2021 Proxy Statement was materially false and misleading because it failed to disclose, *inter alia*, that: (1) the Company was engaged in the Cheating Misconduct and the Copyright Infringement Misconduct; (2) the Company's increase in subscribers and revenue was attributable to its facilitation of cheating in an environment of heightened remote learning, rather than to the factors the Company described; (3) as a result of the foregoing, the Company's surge in subscriptions and revenue would subside once in-person learning returned; (4) as a result of the foregoing, Chegg exaggerated its growth potential throughout the Relevant Period; and (5) the Company failed to maintain internal controls.

64.     Defendants Rosensweig, Sarnoff, Bond, Budig, LeBlanc, Levine, Schlein, Whelan and York caused the 2021 Proxy Statement to be false and misleading. As a result, Chegg shareholders, *inter*

*alia*: (1) elected Defendants LeBlanc, Levine, and Sarnoff as members of the Board, allowing them to continue or begin breaching their fiduciary duties to the Company; and (2) approved on a non-binding basis the compensation of Chegg's named executive officers, including Defendants Rosensweig, Brown, Schultz, and Fillmore, who were breaching their fiduciary duties to Chegg.

65.     On May 3, 2021, Chegg issued a press release announcing its financial results for the quarter ended March 31, 2021. The press release was also attached to a Form 8-K filed by the Company with the SEC the same day. The press release contained the following statement from Defendant Rosensweig, which provided in relevant part as follows: "We are in a unique position to impact the future of the higher education ecosystem[.] . . . ***Our strong brand and momentum will allow us to continue to grow and take advantage of the ever-expanding opportunities*** in the learner economy." (Emphasis added.)

66.     On August 9, 2021, Chegg issued a press release announcing its financial results for the quarter ended June 30, 2021. The press release was also attached to a Form 8-K filed by the Company with the SEC the same day. The press release contained the following statement from Defendant Rosensweig, in which he stated as follows, in relevant part: "It is clear, ***wherever students are learning, whether online, in the classroom, or in a hybrid model, the value of Chegg is unquestionabl***e[.]" (Emphasis added.)

67.     The statements identified in ¶¶ 52–54, 56, and 65–66 were materially false and misleading, and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company was engaged in the Cheating Misconduct and the Copyright Infringement Misconduct; (2) the Company's increase in subscribers and revenue was attributable to its facilitation of cheating in an environment of heightened remote learning, rather than to the factors the Company described; (3) as a result of the foregoing, the Company's surge in subscriptions and revenue would subside once in-person learning returned; (4) as a result of the foregoing, Chegg exaggerated its growth potential throughout the Relevant Period; and (5) the Company failed to maintain internal controls.  As a result of the foregoing, Chegg's public statements were materially false and misleading at all relevant times.

**The Full Truth Emerges**

68.     Pearson commenced the Pearson Lawsuit on September 13, 2021, revealing that Chegg engaged in the Copyright Infringement Misconduct by providing to Chegg subscribers answer sets to Pearson's copyrighted questions, as well as the copyrighted questions of other companies.

69.     The truth finally emerged after the market closed on November 1, 2021, when Chegg announced its financial results for the quarter ended September 30, 2021 in a press release and a Form 10-Q filed with the SEC. Notably included in this quarter was the start of the fall 2021 academic semester, the first semester since the onset of the coronavirus pandemic where remote learning had been significantly cut back. In the press release and the Form 10-Q, the Company revealed, *inter alia*, that: (1) it had a lower number of subscribers than expected; (2) key revenue metrics had contracted or seen decelerated growth; and (3) the Company would not be issuing guidance for the 2022 fiscal year.

70.     From the first quarter of 2021 to the second quarter of 2021, year-over-year revenue growth in the Chegg Services segment declined from 62% to 38%. From the second quarter 2021 to the third quarter 2021, revenue growth in the Chegg Services segment declined further still from 38% to 23%, year-over-year.

71.     Similarly, in the Required Materials segment during this same time, year-over-year revenue growth declined from 15% growth, year-over-year, in the first quarter of 2021, to an 8% *contraction*, year-over-year, by the second quarter of 2021. The Required Materials segment then saw a 28% year-over-year contraction in the third quarter of 2021.

72.     In the November 1, 2021 press release, Defendant Rosensweig acknowledged that "in late September it became clear to us that the education industry is experiencing a slowdown."

73.     On this news, the price per share of the Company's common stock fell $30.64 from the closing price of $62.76 on November 1, 2021 to close on November 2, 2021 at $32.12, a drop of nearly 50%.

**Secondary Public Offering**

74.     During the period in which Chegg's securities traded at artificially inflated prices due to the false and misleading statements and/or omissions of material fact described herein, the Individual

Defendants caused Chegg to offer over 11 million additional shares to investors through a secondary public offering.

75.     According to the Company's February 19, 2021 Form 8-K filed with the SEC, 11,274,600 shares were sold in the secondary public offering at a price of $102 per share, of which 300,000 shares were Defendant Rosensweig's. Chegg estimated it would receive approximately $1.09 billion in net proceeds through the secondary public offering.

76.     Defendant Rosensweig personally gained $29,865,600 by selling his 300,000 shares in the secondary public offering at prices artificially inflated by false and misleading statements he personally made. His proceeds from the secondary public offering demonstrate his motive to make the statements and to pursue a secondary public offering, which exposed Chegg to liability for violations of the Exchange Act.

77.     The Individual Defendants breached their fiduciary duties by causing the Company to engage in this secondary public offering while the price of its securities was artificially inflated due to the misconduct described herein. As a result of their breaches of fiduciary duty and false and misleading statements, Defendant Rosensweig was enriched and the Company was subjected to costly litigation and potential liability in the Securities Class Action for the violations of the Exchange Act.

**Insider Sales**

78.     During the Relevant Period, Defendants Rosensweig, Schultz, Fillmore, Tomasello, Sarnoff, and York made insider sales at prices that were artificially inflated due to the false and misleading statements described herein for collective proceeds of $91.8 million. As explained below, the sales that occurred shortly before or after the Individual Defendants caused Chegg to issue false and misleading statements contribute to an inference that these Individual Defendants were aware of the falsity of the statements and were knowingly profiting off of the deception while Chegg's common stock continued to trade at artificially inflated prices.

79.     Following the false and misleading statements issued in the May 4, 2020 press release, Defendant Shultz sold 47,376 shares of Chegg common stock on May 5, 2020 for proceeds of approximately $3.2 million; Defendant Sarnoff sold 66,666 shares of Chegg common stock on May 13,

2020 for proceeds of approximately $4.3 million; Defendant Rosensweig sold 28,000 shares of Chegg common stock on May 14, 2020 for proceeds of approximately $1.8 million; and Defendant Fillmore sold 49,442 shares of Chegg common stock on May 18, 2020 for proceeds of approximately $3.2 million.

80.     Prior to the false and misleading statements issued in the August 3, 2020 press release, Defendant Schultz sold 82,459 shares of Chegg common stock on July 31, 2020 for proceeds of approximately $6.6 million. Following the false and misleading statements issued in the August 3, 2020 press release, Defendant Rosensweig sold 28,000 shares of Chegg common stock on August 5, 2020 for proceeds of approximately $2.4 million.

81.     Prior to the false and misleading statements issued in the October 26, 2020 press release, Defendant Rosensweig sold 28,000 shares of Chegg common stock on October 12, 2020 for proceeds of approximately $2.3 million.

82.     Following the false and misleading statements issued in the February 8, 2021 press release, Defendant Rosensweig sold 300,000 shares of Chegg common stock in the secondary public offering on February 22, 2021 for proceeds of approximately $29.9 million; and Defendant Fillmore sold 51,505 shares of Chegg common stock on March 3, 2021 for proceeds of approximately $4.8 million.

83.     Just before the filing of the 2021 Proxy Statement on April 16, 2021, which contained false and misleading statements, Defendant Fillmore sold 19,174 shares of Chegg common stock on April 13, 2021 for proceeds of approximately $1.8 million. After the filing of the 2021 Proxy Statement, Defendant Schultz sold 30,000 shares of Chegg common stock on April 23, 2021 for proceeds of approximately $2.8 million. Defendant Schultz sold 30,000 more shares of Chegg common stock on April 26, 2020 for proceeds of approximately $2.9 million. These sales were made just after Chegg made false and misleading statements that artificially inflated the price of its common stock, and they occurred just before Chegg made more false and misleading statements in the May 3, 2021 press release that led to continued artificial inflation of the Company's common stock.

84.     The timing and amounts of these insider sales made at artificially inflated prices demonstrate that the Individual Defendants, including those who served as Company directors, were aware of the falsity of the statements described herein and that those Individual Defendants who engaged in insider sales were using their knowledge of the deceit to enrich themselves while the price of Chegg's common stock remained inflated.

## DAMAGES TO CHEGG

85.     As a direct and proximate result of the Individual Defendants' misconduct, Chegg has lost and expended, and will lose and expend, many millions of dollars.

86.     Such losses include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and six of the Individual Defendants, legal fees associated with the Pearson Lawsuit filed against the Company, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

87.     Such losses also include, but are not limited to, the cost of implementing measures to remediate the Cheating Misconduct and the Copyright Infringement Misconduct.

88.     Such losses also include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

89.     As a direct and proximate result of the Individual Defendants' conduct, Chegg has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

90.     Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

91.     Plaintiff brings this action derivatively and for the benefit of Chegg to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as

directors and/or officers of Chegg, violations of the Exchange Act, as well as the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act.

92.     Chegg is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

93.     Plaintiff is, and has continuously been at all relevant times, a shareholder of Chegg. Plaintiff will adequately and fairly represent the interests of Chegg in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

94.     A pre-suit demand on the Board of Chegg is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Rosensweig, Sarnoff, Bond, Budig, LeBlanc, Levine, Schlein, Whelan and York (collectively, the "Director-Defendants"), and non-party Marcela Martin (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of ten Directors that were on the Board at the time this action was commenced.

95.     Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme described herein that they engaged in knowingly or recklessly, in which they caused or permitted the Company to engage in the Cheating Misconduct and the Copyright Infringement Misconduct and in which they made and/or caused the Company to make false and misleading statements and omissions of material facts. Furthermore, while the price of Chegg's common stock was artificially inflated due to the misconduct described herein, the Director-Defendants breached their fiduciary duties by causing Chegg to initiate a secondary public offering that enriched Defendant Rosensweig while subjecting Chegg to liability for violations of the Exchange Act. In yet further breach of their fiduciary duties owed to the Company, three of the Director-Defendants engaged in insider sales at these artificially inflated prices for a collective $54.5 million in proceeds, demonstrating their motive for engaging in the scheme. As a result of the foregoing, the Director-Defendants are unable to impartially investigate the charges and decide whether to pursue action against themselves as well as the other perpetrators of the scheme.

96.    In total breach of their fiduciary duties, the Director-Defendants knowingly or recklessly participated in the scheme to cause or permit Chegg to engage in the Cheating Misconduct and the Copyright Infringement Misconduct and to make and/or causing Chegg to make materially false and misleading statements. Among other ends, the fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, and are not disinterested. Accordingly, demand upon them is excused as being futile.

97.    Demand on Defendant Rosensweig is futile for the additional following reasons. Defendant Rosensweig is the Company's CEO and President and has served in those roles since February 2010. He also served as Chairperson of the Board from March 2010 to July 2018, and he has served as Co-Chairperson of the Board since July 2018. Chegg provides Defendant Rosensweig with his principal occupation, in which capacity he receives handsome compensation. Thus, he is a non-independent director. Defendant Rosensweig was CEO and Co-Chairperson throughout the Relevant Period, and he therefore had ultimate responsibility for all of the false and misleading statements and omissions made by or on the Company's behalf. Moreover, he personally made false and misleading statements in press releases, as discussed above. Defendant Rosensweig solicited the 2021 Proxy Statement, which contained false and misleading elements. These false and misleading elements contributed to shareholders approving his unjust compensation on an advisory basis. Defendant Rosensweig engaged in insider sales before the fraud was exposed—a number of which coincided with his and the Company's false statements—which yielded approximately $48.8 million in proceeds. As CEO and Co-Chairperson, he conducted little, if any, oversight of Chegg's engagement in the scheme to engage in the Cheating Misconduct and the Copyright Infringement Misconduct and to make false and misleading statements. Furthermore, he consciously disregarded his duties to monitor controls over reporting and engagement in the scheme and consciously disregarded his duties to protect corporate assets. In addition, Defendant Rosensweig is a defendant in the Securities Class Action. Thus, Defendant

Rosensweig breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon him is excused as being futile.

98.     Demand on Defendant Sarnoff is futile for the additional following reasons. Defendant Sarnoff is Co-Chairperson of the Board, a role he has served in since July 2018. He began serving as a Company director in August 2012, and he currently serves on the Audit Committee. Defendant Sarnoff he receives substantial compensation for his role as a director and as Co-Chairperson. Defendant Sarnoff solicited the 2021 Proxy Statement, which contained false and misleading elements that contributed, among other things, to his reelection to the Board. Defendant Sarnoff executed an insider sale before the fraud was exposed that coincided with Chegg making false and misleading statements and which yielded approximately $4.3 million in proceeds. As Co-Chairperson and a longstanding trusted member of the Board, he conducted little, if any, oversight of Chegg's engagement in the scheme to engage in the Cheating Misconduct and the Copyright Infringement Misconduct and to make false and misleading statements. Furthermore, he consciously disregarded his duties to monitor controls over reporting and engagement in the scheme and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Sarnoff is a defendant in the Securities Class Action.[4] Thus, Defendant Sarnoff breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon him is excused as being futile.

99.     Demand on Defendant Bond is futile for the additional following reasons. Defendant Bond has served as a member of the Board since December 2020 and is currently a member of the Compensation Committee. For her role on the Board, Defendant Bond has received and continues to receive significant compensation. Defendant Bond solicited the 2021 Proxy Statement, which contained false and misleading elements. As a trusted member of the Board, she conducted little, if any, oversight of Chegg's engagement in the scheme to engage in the Cheating Misconduct and the Copyright Infringement Misconduct and to make false and misleading statements. Furthermore, she consciously disregarded her duties to monitor controls over reporting and engagement in the scheme and consciously

---

[4] Defendant Sarnoff is named as a defendant in the "Parties" section of the Securities Class Action complaint, though he is not listed in the caption of the complaint.

disregarded her duties to protect corporate assets. Thus, Defendant Bond breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon her is excused as being futile.

100.    Demand on Defendant Budig is futile for the additional following reasons. Defendant Budig has served as a member of the Board since November 2015. She currently serves as Chair of the Audit Committee. For her role on the Board, Defendant Budig has received and continues to receive significant compensation. Defendant Budig solicited the 2021 Proxy Statement, which contained false and misleading elements. As a trusted member of the Board, she conducted little, if any, oversight of Chegg's engagement in the scheme to engage in the Cheating Misconduct and the Copyright Infringement Misconduct and to make false and misleading statements. Furthermore, she consciously disregarded her duties to monitor controls over reporting and engagement in the scheme and consciously disregarded her duties to protect corporate assets. Thus, Defendant Budig breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon her is excused as being futile.

101.    Demand on Defendant LeBlanc is futile for the additional following reasons. Defendant LeBlanc has served as a member of the Board since July 2019. He currently serves as a member of the Governance and Sustainability Committee. For his role on the Board, Defendant LeBlanc has received and continues to receive significant compensation. Defendant LeBlanc solicited the 2021 Proxy Statement, which contained false and misleading elements that, among other things, contributed to his reelection to the Board. As a trusted member of the Board, he conducted little, if any, oversight of Chegg's engagement in the scheme to engage in the Cheating Misconduct and the Copyright Infringement Misconduct and to make false and misleading statements. Furthermore, he consciously disregarded his duties to monitor controls over reporting and engagement in the scheme and consciously disregarded his duties to protect corporate assets. Thus, Defendant LeBlanc breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon him is excused as being futile.

102.     Demand on Defendant Levine is futile for the additional following reasons. Defendant Levine has served as a member of the Board since May 2013. She also serves as Chair of the Governance and Sustainability Committee and as a member of the Compensation Committee. For her roles on the Board, Defendant Levine has received and continues to receive significant compensation. Defendant Levine solicited the 2021 Proxy Statement, which contained false and misleading elements that contributed to her reelection to the Board. As a trusted member of the Board, she conducted little, if any, oversight of Chegg's engagement in the scheme to engage in the Cheating Misconduct and the Copyright Infringement Misconduct and to make false and misleading statements. Furthermore, she consciously disregarded her duties to monitor controls over reporting and engagement in the scheme and consciously disregarded her duties to protect corporate assets. Thus, Defendant Levine breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon her is excused as being futile.

103.     Demand on Defendant Schlein is futile for the additional following reasons. Defendant Schlein has served as a member of the Board since December 2008, and he currently serves as a member of both the Governance and Sustainability Committee and the Audit Committee. For his roles on the Board, Defendant Schlein has received and continues to receive significant compensation. Defendant Schlein solicited the 2021 Proxy Statement, which contained false and misleading elements. As a trusted member of the Board, he conducted little, if any, oversight of Chegg's engagement in the scheme to engage in the Cheating Misconduct, the Copyright Infringement Misconduct, and to make false and misleading statements. Furthermore, he consciously disregarded his duties to monitor controls over reporting and engagement in the scheme and consciously disregarded his duties to protect corporate assets. Thus, Defendant Schlein breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon him is excused as being futile.

104.     Demand on Defendant Whelan is futile for the additional following reasons. Defendant Whelan has served as a member of the Board since June 2019. She currently serves as a member of the Compensation Committee. For her role on the Board, Defendant Whelan has received and continues to receive significant compensation. Defendant Whelan solicited the 2021 Proxy Statement, which

contained false and misleading elements. As a trusted member of the Board, she conducted little, if any, oversight of Chegg's engagement in the scheme to engage in the Cheating Misconduct and the Copyright Infringement Misconduct and to make false and misleading statements. Furthermore, she consciously disregarded her duties to monitor controls over reporting and engagement in the scheme and consciously disregarded her duties to protect corporate assets. Thus, Defendant Whelan breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon her is excused as being futile.

105.    Demand on Defendant York is futile for the additional following reasons. Defendant York has served as a member of the Board since June 2013. He currently serves as Chair of the Compensation Committee and as a member of the Governance and Sustainability Committee. For his roles on the Board, Defendant York has received and continues to receive significant compensation. Defendant York solicited the 2021 Proxy Statement, which contained false and misleading elements. Defendant York engaged in insider sales before the fraud was exposed, which yielded approximately $1.4 million in proceeds. As a trusted member of the Board, he conducted little, if any, oversight of Chegg's engagement in the scheme to engage in the Cheating Misconduct, the Copyright Infringement Misconduct, and to make false and misleading statements. Furthermore, he consciously disregarded his duties to monitor controls over reporting and engagement in the scheme and consciously disregarded his duties to protect corporate assets. Thus, Defendant York breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Accordingly, demand upon him is excused as being futile.

106.    Demand on the Board is futile for the additional following reasons.

107.    In violation of federal law, Defendants Rosensweig, Sarnoff, and York directly engaged in insider trading. While possessing material non-public information, Defendants Rosensweig, Sarnoff, and York engaged in insider transactions that resulted in proceeds in excess of $54.5 million. Such transactions were executed during the period when Chegg's stock price was artificially inflated due to the false and misleading statements alleged herein. Of these three Director-Defendants, Defendant Rosensweig's and Defendant Sarnoff's insider sales in particular coincided with Chegg issuing false and

misleading statements. Thus, demand as to Defendants Rosensweig, Sarnoff, and York is excused as being futile.

108.    Defendants Rosensweig, Sarnoff, Bond, Budig, LeBlanc, Levine, Schlein, Whelan and York approved Chegg's secondary public offering of its common stock, which occurred in February 2021. In the secondary public offering, shares of Company common stock were sold to investors at prices artificially inflated by the Individual Defendants' misconduct. The secondary public offering enriched Defendant Rosensweig by $29,865,600 and caused the Company to violate the Exchange Act. As a result, the Company and certain of the Individual Defendants have been subjected to a substantial likelihood of liability in the Securities Class Action. Accordingly, demand as to Defendants Rosensweig, Sarnoff, Bond, Budig, LeBlanc, Levine, Schlein, Whelan, and York is excused as being futile.

109.    There are longstanding business and personal relationships between the Director-Defendants and between the Director-Defendants and the other Individual Defendants that preclude the Director-Defendants from acting independently and in the Company's and its shareholders' best interests. For instance, Defendants Rosensweig, Brown, Schultz, Fillmore, and Sarnoff have worked at Chegg together for approximately a decade. Defendant Schultz, having the longest tenure, joined in 2008, and Defendant Fillmore, the last of these five to join Chegg, arrived in 2013. Defendants Bond and Levine were students together in Harvard Business School's MBA program in 2005. These conflicts of interest precluded the Director-Defendants from adequately monitoring Chegg's operations and internal controls and calling into question each other's and the remaining Individual Defendants' conduct. Thus, demand is excused as being futile.

110.    Defendants Budig (as Chair), Sarnoff, and Schultz (collectively, the "Audit Committee Defendants"), served on Chegg's Audit Committee during the Relevant Period. In violation of Chegg's Audit Committee Charter, the Audit Committee Defendants engaged in or permitted the scheme to cause the Company to engage in the Cheating Misconduct and the Copyright Infringement Misconduct, to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act. In addition, the Audit Committee Defendants violated the Audit Committee Charter by

failing to adequately discuss with management the Company's financial information prior to public distribution and by failing to adequately oversee: (1) the integrity of Chegg's financial disclosures; (2) Chegg's compliance with legal and regulatory requirements; (3) the Company's risk assessments and risk management; and (4) the Company's disclosure controls and procedures. Thus, the Audit Committee Defendants breached their fiduciary duties and are not disinterested. Accordingly, demand is excused as to them.

111.    The Director-Defendants violated Chegg's Code of Conduct by engaging in or permitting the scheme to cause Chegg to engage in the Cheating Misconduct and the Copyright Infringement Misconduct, to issue materially false and misleading statements, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to act with integrity, supported and profited from unethical academic behavior, failed to avoid conflicts of interest, failed to respect other companies' intellectual property rights, engaged in insider trading, failed to ensure the accuracy of Chegg's disclosures, failed to ensure Chegg complied with applicable laws, rules, and regulations, and failed to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Chegg's Code of Conduct and are not disinterested. Accordingly, demand is excused as to them.

112.    The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Director-Defendants or other wrongdoers to attempt to recover for Chegg any part of the damages Chegg suffered and will continue to suffer. Thus, demand upon the Directors is excused as being futile.

113.    The acts described herein are incapable of ratification because they constitute violations of fiduciary duties owed by Chegg's officers and directors.

114.    The Director-Defendants may be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused Chegg to purchase it for their protection with corporate funds, i.e., monies belonging to Chegg stockholders. If there is a directors' and officers' liability insurance policy covering

the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Chegg, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such a policy exists, will provide a basis for Chegg to effectuate a recovery. Therefore, demand on the Director-Defendants is excused as being futile.

115. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Chegg to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

116. The Individual Defendants' conduct described herein was based on bad faith and intentional, reckless, or disloyal misconduct, and it therefore could not have been the product of legitimate business judgment. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter, to the extent such a provision exists. As all of the Director-Defendants, and if not all at least a majority of the Directors, face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed capable of exercising independent and disinterested judgment regarding whether to pursue this action on behalf of Chegg shareholders. Accordingly, demand is excused as being futile.

117. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

**Against Defendants Rosensweig, Sarnoff, Bond, Budig, LeBlanc, Levine, Schlein, Whelan and York for Violations of Section 14(a) of the Exchange Act**

118. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

119.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

120.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

121.    Under the direction and watch of Defendants Rosensweig, Sarnoff, Bond, Budig, LeBlanc, Levine, Schlein, Whelan and York, the 2021 Proxy Statement failed to disclose that: (1) the Company was engaged in the Cheating Misconduct and the Copyright Infringement Misconduct; (2) the Company's increase in subscribers and revenue was attributable to its facilitation of cheating in an environment of heightened remote learning, rather than to the factors the Company described; (3) as a result of the foregoing, the Company's surge in subscriptions and revenue would subside once in-person learning returned; (4) as a result of the foregoing, Chegg exaggerated its growth potential throughout the Relevant Period; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

122.    Under the direction and watch of Defendants Rosensweig, Sarnoff, Bond, Budig, LeBlanc, Levine, Schlein, Whelan and York, the 2021 Proxy Statement further failed to disclose that: (1) though Chegg asserted that it used certain metrics in awarding performance-based compensation to "ensure[] our executive officers are incentivized in accordance with the long-term interests of our stockholders," the metrics actually rewarded Chegg's executive officers for a short-term increase in revenue caused by a combination of the coronavirus pandemic and the Cheating Misconduct, which

metrics would materially decline once widespread remote learning ended; (2) though Chegg claimed its directors and officers adhered to the Code of Conduct and that it would disclose any waivers thereof, the Individual Defendants violated the Code of Conduct either without waivers or without such waivers being disclosed; and (3) the Board and the Board's committees were not properly exercising their risk oversight functions, including the review of the described risk exposures, as evidenced by wrongdoing described herein, which involved certain directors.

123.    In the exercise of reasonable care, Defendants Rosensweig, Sarnoff, Bond, Budig, LeBlanc, Levine, Schlein, Whelan and York should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements in the 2021 Proxy Statement were materially false and misleading. The misrepresentations and omissions of material fact were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2021 Proxy Statement, including but not limited to, the election of directors and the approval on a non-binding advisory basis of the compensation of the Company's executives.

124.    The false and misleading elements of the 2021 Proxy Statement, led Company shareholders to, among other things: (1) elect Defendants LeBlanc, Levine, and Sarnoff as members of the Board, allowing them to continue or begin breaching their fiduciary duties to the Company; and (2) approve on a non-binding basis the compensation of the Company's named executive officers, including Defendants Rosensweig, Brown, Schultz, and Fillmore, who were breaching their fiduciary duties to the Company.

125.    Chegg was damaged as a result of Defendants Rosensweig, Sarnoff, Bond, Budig, LeBlanc, Levine, Schlein, Whelan and York's material misrepresentations and omissions of material fact in the 2021 Proxy Statement.

126.    Plaintiff on behalf of Chegg has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

127.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

128.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Chegg's business and affairs.

129.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

130.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Chegg.

131.   In breach of their fiduciary duties owed to Chegg, the Individual Defendants willfully or recklessly made and/or caused Chegg to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company was engaged in the Cheating Misconduct and the Copyright Infringement Misconduct; (2) the Company's increase in subscribers and revenue was attributable to its facilitation of cheating in an environment of heightened remote learning, rather than to the factors the Company described; (3) as a result of the foregoing, the Company's surge in subscriptions and revenue would subside once in-person learning returned; (4) as a result of the foregoing, Chegg exaggerated its growth potential throughout the Relevant Period; and (5) the Company failed to maintain internal controls. As a result of the foregoing, Chegg's public statements were materially false and misleading at all relevant times.

132.   In further breach of their fiduciary duties, the Individual Defendants caused or permitted Chegg to engage in the Cheating Misconduct and the Copyright Infringement Misconduct.

133.   The Individual Defendants failed to correct and/or caused Chegg to fail to correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties. Moreover, the Individual Defendants also failed to rectify and/or caused Chegg to fail to rectify any of the wrongs described herein.

134.   Also in breach of their fiduciary duties, the Individual Defendants caused Chegg to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

135.     During the Relevant Period, six of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements and omissions of material fact discussed herein. As a result, these six Individual Defendants reaped proceeds of approximately $91.8 million.

136.     The Individual Defendants had actual or constructive knowledge that Chegg issued materially false and misleading statements, but they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Chegg's securities and disguising lucrative insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

137.     The Individual Defendants had actual or constructive knowledge that they had caused Chegg to engage in the Cheating Misconduct and the Copyright Infringement Misconduct and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the Cheating Misconduct and the Copyright Infringement Misconduct, and that internal controls were not adequately maintained, or they acted with reckless disregard for the truth, in that they caused Chegg to engage in the Cheating Misconduct and the Copyright Infringement Misconduct and to fail to maintain adequate internal controls, even though the facts surrounding such misconduct were available to them. The improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

138.     These actions were not a good-faith exercise of prudent business judgment to protect and promote Chegg's corporate interests.

139.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Chegg has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

140.   Plaintiff on behalf of Chegg has no adequate remedy at law.

### THIRD CLAIM

**Against Defendants Rosensweig, Brown, Schultz, Fillmore, Tomasello, and Sarnoff for Contribution Under Sections 10(b) and 21D of the Exchange Act**

141.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

142.   Chegg, along with Defendants Rosensweig, Brown, Schultz, Fillmore, Tomasello, and Sarnoff, are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, its liability will be in whole or in part due to Defendants Rosensweig's, Brown's, Schultz's, Fillmore's, Tomasello's, and Sarnoff's willful and/or reckless violations of their obligations as officers and/or directors of Chegg.

143.   Defendants Rosensweig, Brown, Schultz, Fillmore, Tomasello, and Sarnoff, because of their positions of control and authority as officers and/or director of Chegg, were able to and did, directly and/or indirectly, exercise control over the Chegg's business and corporate affairs, including the wrongful acts complained of herein and in the Securities Class Action.

144.   Accordingly, Defendants Rosensweig, Brown, Schultz, Fillmore, Tomasello, and Sarnoff are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

145.   As such, Chegg is entitled to receive all appropriate contribution or indemnification from Defendants Rosensweig, Brown, Schultz, Fillmore, Tomasello, and Sarnoff.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Chegg, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to the Company;

(c)     Determining and awarding to the Company the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Chegg and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the Company's shareholders to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding the Company restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: March 30, 2022                              Respectfully submitted,

                                                        **THE ROSEN LAW FIRM, P.A.**

                                                        */s/Laurence M. Rosen*
                                                        Laurence M. Rosen (SBN 219683)
                                                        355 S. Grand Avenue, Suite 2450
                                                        Los Angeles, CA 90071
                                                        Telephone: (213) 785-2610
                                                        Facsimile: (213) 226-4684
                                                        Email: lrosen@rosenlegal.com

                                                        *Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

      I,   Joseph Robinson  am  a    plaintiff  in   the within     action. I have reviewed the allegations made  in  this  shareholder  derivative complaint, know the contents thereof,  and  authorize  its  filing. To those allegations  of which  I have personal  knowledge,  I believe those allegations to be true. As to  those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

      I declare under penalty of perjury, that the foregoing is true and correct. Executed this _th day of _____, 2022.

3/22/2022

Joseph Robinson

_____

Joseph Robinson